IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

**LESTER LEE,**
   Plaintiff Pro Se

**v.**　　　　　　　　Case No. 8:24-cv-01205-ABA

**BROOKSIDE PARK CONDOMINIUM, INC.,**
**METROPOLIS (MCM, INC.),**
**RAMMY AZOULAY,**
**LAMONT SAVOY,**
   Defendants.

## PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

## AND ORDER TO PRESERVE EVIDENCE

### I. Introduction

Plaintiff Lester Lee, proceeding pro se, respectfully moves this Court for an emergency Temporary Restraining Order (TRO) and an accompanying Order to Preserve Evidence against the above-named Defendants. This motion is based on credible and escalating threats to Plaintiff's personal safety, health, and civil rights, resulting from a pattern of unlawful surveillance, retaliatory conduct, and coordinated litigation abuse.

Defendants have installed or authorized surveillance devices—including an AI-powered license plate reader, a peephole camera directly across from Plaintiff's residence, and a Ring camera aimed at Plaintiff's movements—without Plaintiff's knowledge or consent. These actions violate the Maryland Wiretap Act (Md. Code, Cts.

& Jud. Proc. § 10-402) and constitute ongoing retaliation under the Fair Housing Act (42 U.S.C. § 3617) and Americans with Disabilities Act (ADA).

Plaintiff now faces imminent harm, having received credible information that neighborhood members are being incited by Defendants' false narratives and surveillance directives. The chilling effect on Plaintiff's ability to access and maintain housing, engage in litigation, or even leave home safely constitutes irreparable injury. The Court's immediate intervention is necessary to prevent further damage.

**II. Factual Background**

In 2023, a peephole camera was installed directly across from Plaintiff's unit door without his consent. When Plaintiff contacted management to inquire about its legality, he was falsely assured that the installation was permissible. This camera, facing directly toward Plaintiff's door, served no legitimate security purpose and contributed to a growing pattern of targeted surveillance.

In Summer 2024, a Ring doorbell camera was installed outside of the residence of Latricia Hicks, located two floors below Plaintiff. Despite the distance, the device was clearly positioned to monitor Plaintiff's comings and goings. According to an internal August 9, 2024 email from Defendant Robert Haddad to other board members and legal counsel, this camera was installed at his direction for the express purpose of monitoring Plaintiff's movements. (See Exhibit 5.)

Most recently, in or around April 2025, Defendants installed an AI-powered license plate reader camera at Brookside Park Condominium without notifying residents or disclosing any policy for its use or data retention. Since its installation, Plaintiff has experienced escalated targeting, including increased monitoring, staff interference, and retaliatory enforcement actions.

Photos of both the peephole and Ring devices are attached as Exhibit 6. These confirm not only their placement but also that they are positioned specifically to capture Plaintiff's front door and movement patterns.

Plaintiff submitted a sworn declaration and affidavit (Exhibits 7.4 and 8) detailing the broader pattern of discovery abuse and threats of violence resulting from surveillance, along with the manipulation of outside entities like DPIE to target Plaintiff rather than resolve legitimate repair complaints.

### III. Legal Standard

A temporary restraining order is an extraordinary remedy intended to prevent immediate and irreparable harm before a full hearing can be held. Under Rule 65 of the Federal Rules of Civil Procedure, the Court may grant such relief when the movant demonstrates:

1. **A likelihood of success on the merits**;

2. **A likelihood of suffering irreparable harm in the absence of preliminary relief**;

3. **That the balance of equities tips in the movant's favor**; and

4. **That an injunction is in the public interest.**

*See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

The burden lies with the movant to establish that each of these factors favors relief. Courts in the Fourth Circuit apply these elements with flexibility in light of the specific context and equities at issue, especially in matters involving civil rights or constitutional harms.

## IV. Argument

### 1. Plaintiff Is Likely to Succeed on the Merits

Plaintiff brings claims under the Fair Housing Act, the Americans with Disabilities Act, and the Maryland Wiretap Act. Defendants' conduct—coordinated surveillance, retaliatory interrogatories, refusal to accommodate, and misuse of legal processes—clearly implicates each statute. Plaintiff has presented sworn declarations and documentary evidence showing that surveillance devices were installed at the direction of Defendant Robert Haddad, and with the knowledge of defense counsel Anthony D. Dwyer, to monitor Plaintiff's movements in retaliation for protected activity. (See Exhibits 5, 6, 7.4, 8.)

The ADA expressly prohibits discrimination against individuals with disabilities

based on the breed of their service animals. Federal law supersedes any conflicting state or local ordinance. Thus, any reliance by Defendants on Prince George's County's pit bull ordinance is preempted by the ADA's protections. The only remaining argument Defendants appear to rely on is the claim that Plaintiff's service dogs caused damage to the unit. However, this claim was explicitly refuted by the County's own housing inspector in sworn deposition testimony. (See Exhibit 8.)

Defendants are therefore left without a valid legal defense. Their posture in this litigation is not that of parties asserting a lawful justification for their conduct, but rather that of parties engaged in character assassination and strategic retaliation.

Furthermore, Defendant Robert Haddad's conduct reflects a sustained pattern of abuse of authority and retaliation. He has submitted a false affidavit in this case, disseminated Plaintiff's confidential medical information without authorization, and repeatedly harassed Plaintiff's current landlord through false and threatening emails. Haddad has also anonymously contacted animal control on multiple occasions and verbally abused Plaintiff in connection with his disability and legal rights.

Haddad has openly expressed disdain for the federal legal system and has characterized Plaintiff's civil rights claims as a "sham." His brazen statement to Plaintiff's landlord—where he declared that he would reject any future accommodation request at Plaintiff's new residence—confirms that his actions are not based on housing

policy, but on personal animus and unlawful retaliation.

In addition to the above, Haddad falsely claimed that Plaintiff was only permitted to have one dog at his current residence. This misstatement of the law was immediately corrected by Plaintiff's landlord's representative, who properly informed Haddad that service animals are not considered pets under federal law and are exempt from any numerical pet restrictions. Haddad's continued misrepresentations regarding Plaintiff's service dog status further demonstrate his intent to interfere with and undermine federally protected accommodations.

In one such instance, Haddad attempted to deceive Plaintiff's current landlord into executing a lease addendum that operated as a de facto, irrevocable power of attorney—granting Haddad legal authority to enter Plaintiff's unit without the landlord's consent, initiate eviction proceedings, and pursue legal action as though he were the property owner. This action, taken under the false pretense of enforcing parking rules, was both fraudulent in nature and well beyond any lawful authority conferred by the condominium's governing documents or state law. Such behavior demonstrates an alarming disregard for property rights and due process protections.

Moreover, Plaintiff has reason to believe that Haddad is actively coordinating with counsel who previously represented him, including arranging meetings with potential witnesses to influence testimony, control the narrative, and coerce statements favorable to the defense. This conduct is not only unethical but further proves the need

for court intervention. The result of Haddad's actions has been to incite fear among residents, create hostility toward Plaintiff, and undermine the integrity of the proceedings. He is unfit to serve in any position of authority in this matter.

Most recently, on or about June 11, 2025, Robert Haddad contacted a representative of Plaintiff's current landlord and falsely claimed that Plaintiff's service dog had attacked another dog and that Plaintiff owed the other dog's owner for veterinary care. In reality, the incident in question had already been resolved amicably between the parties involved. The other dog was not seriously injured, and both parties mutually agreed that the animal should be checked by a vet. Plaintiff voluntarily offered to cover the cost, and the owner accepted $100—more than the documented $76 vet bill. Text messages confirming this agreement and payment were submitted by Plaintiff.

Nevertheless, Haddad falsely informed the landlord's representative that Plaintiff had not paid and that the matter was still pending. He further claimed that the other dog owner had executed an affidavit to that effect—despite there being no ongoing dispute or complaint. Plaintiff reasonably believes that Haddad either coerced or misled the individual into making such a statement in an effort to revive a resolved issue as a legal weapon. This incident is yet another example of Haddad's ongoing strategy to misrepresent facts, escalate minor resolved matters into grounds for eviction, and use his position to control and intimidate others.

When viewed in conjunction with his prior attempt to force Plaintiff's landlord into signing a lease addendum functioning as an irrevocable power of attorney, the pattern is clear: Haddad seeks unfettered authority to access Plaintiff's unit and remove him from his home under any pretense, regardless of legality or truth. Such conduct represents an alarming abuse of power and an escalating threat to Plaintiff's rights and safety.

Plaintiff further observes suspicious activity involving a vacant, bank-owned unit adjacent to his current residence. Following a legitimate repair request related to a leak, the property management staff was granted temporary access to address the issue. However, since that time, management has continued to access the unit without any disclosed reason or authorization. The property is under the control of a bank-designated realtor and contractor, yet staff not affiliated with those parties have been seen entering the space repeatedly.

Plaintiff reasonably believes that the true purpose of this continued access is covert surveillance, particularly in light of the broader pattern of unauthorized monitoring and retaliatory conduct outlined above. The use of a vacant neighboring unit as a surveillance post—especially without the consent of the property's rightful agent—raises serious legal and ethical concerns, and reinforces the need for urgent injunctive relief to halt all surveillance activity by or on behalf of the Defendants.

The conduct described above is not accidental or incidental. It is the deliberate

weaponization of legal and managerial authority by Defendant Robert Haddad to attack, surveil, and destabilize Plaintiff. Anthony Dwyer, acting as counsel, has enabled and escalated this abuse by facilitating meetings with witnesses, submitting coordinated interrogatories, and reinforcing Haddad's retaliatory agenda. Together, their actions represent an organized campaign of coercion and abuse, not a legitimate defense.

Defendants have shown that they are willing to disregard federal disability law and the authority of this Court. Their tactics reflect a belief that Plaintiff, due to his disability and pro se status, will be unable to enforce his rights. This disdain for legal process and civil rights cannot be permitted to continue unchecked.

Defendants have further attempted to mislead the Court by citing irrelevant case law such as *Scroggins v. Lee's Crossing HOA*, a case involving the denial of ATV use on a walking trail, which bears no legal or factual similarity to the denial of a service dog accommodation under the ADA and FHA. This citation is legally inapposite and misleading, as it distracts from the actual issue—breed-neutral protection for service dogs under federal law.

**2. Plaintiff Faces Irreparable Harm**

The Defendants failed to respond to Plaintiff's original request for a reasonable accommodation until nearly three months after the formal complaint was filed. When they did respond, the only reasons cited were the Prince George's County ordinance banning pit bulls and alleged property damage caused by Plaintiff's service animals—claims which have been thoroughly rebutted and found to be unsubstantiated, including

by sworn testimony from a DPIE inspector (see Exhibit 8).

Plaintiff has experienced fear, psychological distress, and chilling of basic movement and litigation access. These harms cannot be undone by monetary relief. Moreover, surveillance designed to provoke neighborhood hostility risks escalation to physical harm. Courts consistently hold that loss of housing stability and personal security constitute irreparable harm. See *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984).

Plaintiff's service dogs are lawfully registered with Prince George's County, and Defendants' refusal to acknowledge this legal status is akin to rejecting a valid Maryland-issued driver's license. In fact, Defendant Robert Haddad went so far as to inform Plaintiff's current landlord that any future request for reasonable accommodation would also be summarily denied, regardless of merit or necessity. This preemptive refusal illustrates an entrenched and unlawful pattern of animus against Plaintiff's federally protected rights and reinforces the necessity of judicial intervention. Their denial of federally protected rights is not grounded in law, but in discriminatory animus. Having no valid defense, Defendants have chosen instead to attack Plaintiff psychologically, legally, and socially in an attempt to exhaust and discredit him.

**3. The Balance of Equities Favors Plaintiff**

The balance of hardships weighs heavily in Plaintiff's favor. Plaintiff is a disabled individual facing ongoing surveillance, harassment, and retaliation while trying to litigate pro se under the Fair Housing Act and ADA. The requested TRO would serve only to

halt further harm and preserve the status quo. By contrast, Defendants would suffer no legal hardship by being restrained from engaging in surveillance or interference that is likely unlawful and retaliatory.

Preventing further coercion and intimidation does not impose a burden—it reinforces the law. Meanwhile, denying relief would subject Plaintiff to ongoing privacy violations, housing instability, and safety threats. The equities thus tip decisively toward Plaintiff. See *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (noting that balance favors relief where denial would cause irreparable harm and granting would not harm defendants).

**4. The Public Interest Supports Injunctive Relief**

The public has a compelling interest in protecting the civil rights of disabled individuals, preventing retaliation against tenants for asserting fair housing protections, and ensuring the legal process is not undermined by coercion, surveillance, or intimidation. The requested relief supports not only Plaintiff's safety and dignity, but also the broader enforcement of the Fair Housing Act and Americans with Disabilities Act.

Allowing Defendants to continue unchecked would send a message that housing authorities and their agents may retaliate with impunity against those who assert their rights. Courts have recognized that upholding disability rights and halting discriminatory practices serves the greater public good. See *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003) (affirming public interest in enforcement of the FHA and ADA).

Additionally, this case has broad-reaching implications due to the conflicting local ordinance in Prince George's County, Maryland, which currently bans certain dog breeds without clearly exempting federally protected service animals. While the ordinance includes exemptions for canines and show dogs, it fails to acknowledge ADA-compliant service animals. The lack of clarity has caused confusion among property managers, enforcement agencies, and residents.

Plaintiff respectfully asserts that this case presents an opportunity to reinforce that federal law—including the ADA—clearly supersedes any local or state ordinance that discriminates against service dogs on the basis of breed. A favorable ruling in this matter would help ensure that such discriminatory applications are not repeated and would serve as a guiding precedent for future interpretation and enforcement.

**5. Defendants Are Actively Obstructing the Administration of Justice**

The coordinated conduct of Robert Haddad and Anthony Dwyer reflects not only civil rights violations, but also a calculated attempt to obstruct the judicial process. Haddad has submitted a false affidavit, disseminated misinformation, and taken steps to discredit Plaintiff by contacting his current landlord and other third parties involved in the case. Simultaneously, Dwyer has participated in coaching witnesses, misusing

interrogatories, and intimidating former counsel during depositions.

These actions rise to the level of obstruction, intimidation, and witness tampering—each of which undermines the integrity of these proceedings. See *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (recognizing courts' inherent power to sanction conduct that abuses the judicial process). The Court retains full authority to address such interference and to refer these matters for further investigation or discipline.

### V. Requested Relief

WHEREFORE, Plaintiff respectfully requests that this Court:

1. **Issue a Temporary Restraining Order** enjoining Defendants and their agents from continuing or initiating any surveillance—physical, electronic, or otherwise—of Plaintiff, his residence, or his movements;

2. **Order Defendants to immediately cease and remove** all AI-powered license plate readers, unauthorized peephole or doorbell cameras, and any surveillance equipment directed at Plaintiff's residence; and to **identify the existence and location of any hidden, undisclosed, or unauthorized surveillance device**s—electronic or otherwise—anywhere within the Brookside Park Condominium community, including but not limited to devices installed near or within properties visited or frequented by Plaintiff or his known associates;

3. **Order Defendants to preserve** all surveillance footage, metadata, access logs, communications, and other electronic records related to Plaintiff's housing and legal proceedings;

4. **Enjoin Defendants and their attorneys** from initiating or continuing contact with Plaintiff's current landlord, neighbors, or potential witnesses for the purpose of influencing housing or testimony;

5. **Temporarily suspend Defendant Robert Haddad** from any position of authority within the Brookside Park Condominium Association, including but not limited to decision-making, enforcement, or communications involving Plaintiff's tenancy, pending final resolution of this matter; and **bar both Robert Haddad and Anthony Dwyer** from participating in or directing any actions involving Plaintiff's current or future housing accommodations, in order to prevent the continued use of legal authority as a means of coercion, fabrication, and retaliation;

6. **Grant any further relief** that this Court deems just, proper, and necessary to protect Plaintiff's rights and safety under federal law;

7. **Refer the conduct of Defendants Robert Haddad and Anthony Dwyer for judicial review** or disciplinary investigation based on allegations of obstruction of justice, witness coercion, and abuse of process under the Court's inherent authority to preserve the integrity of these proceedings.

Respectfully submitted,



Lester Lee

Plaintiff Pro Se

535 Wilson Bridge Drive, B1

Oxon Hill, MD 20745

LLEE.DOCUMENTS@gmail.com

Date: June 12, 2025